## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 22-cv-1123-WJM-MDB

JOSEPH HEFFNER, as trustee of the JOSEPHINE RENARD TRUST,

     Plaintiff,

v.

TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA, a foreign
corporation, and
DSI HOLDINGS CORPORATION, d/b/a SERVICE MASTER DSI, a foreign corporation,

     Defendants.

---

### ORDER GRANTING DEFENDANT TRAVELERS CASUALTY INSURANCE COMPANY OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

---

Before the Court is Defendant Travelers Casualty Insurance Company of America's ("Travelers") Motion for Summary Judgment ("Motion"). (ECF No. 77.) Plaintiff Joseph Heffner, as trustee of the Josephine Renard Trust ("JRT"), filed a response. (ECF No. 86.) Travelers filed a reply. (ECF No. 32.) For the following reasons, the Motion is granted.

### I. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if

the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. MATERIAL FACTS[1]

### A.    The Policy

Travelers insured JRT's real property located at 18600 E. U.S. Highway 24 in Peyton, Colorado ("Property").  The Policy insured the Property against direct physical loss or damage caused by or resulting from a Covered Cause of Loss, subject to the Policy's terms, conditions, limitations, and exclusions.  (ECF No. 77-1.)

In the Coverage section, the Policy specifically provides that "We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss."  Further, the Policy states that covered property includes "the building or structure described in the Declarations including . . .  3) Fixtures."  The Policy includes coverage for "permanently attached machinery and equipment" that suffers physical loss or damage "caused by or

---

[1] The following factual summary is based on the parties' briefs on the Motion and documents submitted in support thereof.  These facts are undisputed unless attributed to a party or source.  All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.

resulting from a Covered Cause of Loss."

The Policy also contains the following provision regarding Ordinance or Law:

**k.  Ordinance or Law**

**(1)** In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay for:

**(a)** Loss in value of the undamaged portion of the building as a consequence of enforcement of the minimum requirements of any ordinance or law that requires the demolition of undamaged parts of the same building;

**(b)** Demolition cost, meaning the cost to demolish and clear the site of undamaged parts of the same building as a consequence of enforcement of the minimum requirements of any ordinance or law that required demolition of such undamaged property; and

**(c)** The increased cost of construction, meaning the increased cost to repair, rebuild or construct the property as a consequence of enforcement of the minimum requirements of any ordinance or law. This increased cost of construction coverage applies only if:

**(i)** The building is insured for replacement cost;

**(ii)** The building is repaired, rebuilt or reconstructed; and

**(iii)** The repaired, rebuilt or reconstructed building is intended for similar occupancy as the current building, unless otherwise required by zoning or land use ordinance or law.

**(2)** The ordinance or law referred to in this Additional Coverage is an ordinance or Law that:

**(a)** Regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and

**(b)** Is in force at the time of the loss.

3

The Policy's Covered Causes of Loss section provides coverage for RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

> a. Limited in Paragraph A.5. Limitations; or
> b. Excluded in Paragraph B. Exclusions.

The Policy's Exclusions section states: "We will not pay for loss or damage caused by or resulting from any of the following: (1) wear and tear; (2) rust, corrosion, fungus, decay, deterioration, wet or dry rot, mold, hidden or latent defect or any quality in property that causes it to damage or destroy itself . . . ."

The Policy's Loss Payment provision states as follows: "[i]n the event of loss or damage covered by this Coverage Form, at our option, we will either . . . Repair, rebuild or replace the property with other property of like kind and quality . . . ."

Paragraph e of the Loss Payment provision states in relevant part:

> We will determine the value of Covered Property in the event of covered loss or damage as follows: (1) At replacement cost (without deduction for depreciation), except as provided in Paragraphs (2) through (18) below . . .  (b) We will not pay on a replacement cost basis for any loss or damage: (i) Until the lost or damaged property is actually repaired or replaced; and (ii) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage. (c) We will not pay more for loss or damage on a replacement cost basis than the least of Paragraphs (i), (ii) or (iii) subject to Paragraph (d) below: (i) The Limit of Insurance applicable to the lost or damaged property; (ii) The cost to replace the lost or damaged property with other property: a) Of comparable material and quality; and b) Used for the same purpose; or (iii) The amount actually spent that is necessary to repair or replace the lost or damaged property.

## B.    Knuckle Head 339

Before the fire at the Property, described in more detail below, the Property was rented to Knuckle Head 339, LLC ("Knuckle Head"), a tenant that operated the Property as a bar and restaurant.  JRT insured the real property and the fixtures and equipment

at the Property, while Knuckle Head was responsible for its own "business personal
property [*sic*]."  JRT and Knuckle Head both used Travelers for their insurance needs.

**C.      December 16, 2020 Fire at the Property**

On or about December 16, 2020, a fire occurred at the Property as a result of
arson, which caused property damage.  JRT, through its representative Kristine Heffner,
reported the loss to Travelers on December 16, 2020; Travelers designated the claim as
Claim No. FNF8969 and assigned it to adjuster Matt Kovarna.  Travelers understood
that Kristine Heffner was JRT's primary point of contact.

Upon receiving notice of a fire loss at the property on December 16, 2020,
Travelers promptly contacted Kristine Heffner.  (ECF No. 77 at 5 ¶ 8.)  It is undisputed
that during her initial call with Travelers on December 16, 2020, Kristine Heffner
declined "Mitigation Dispatch Services."  There is some dispute concerning the referral
of DSI Holdings Corporation d/b/a ServiceMaster DSI ("ServiceMaster") to work on the
Property, though Travelers admits that it did not refer ServiceMaster to JRT.  (ECF No.
86 at 3 ¶ 8; ECF No. 93 at 1 ¶ 8.)  It appears as though Knuckle Head received the
referral.  (*Id.*)

**D.      ServiceMaster's Work on the Property**

The parties dispute the nature of Travelers and ServiceMaster's relationship, with
JRT stating that ServiceMaster has a "general authorization" it signed to do work on
Travelers' behalf (ECF No. 86 at 15 ¶ 65), and Travelers stating that the vendor
mitigation services program only provides the names of mitigation vendors to Travelers'
insureds but does not authorize them to work on Travelers' behalf (ECF No. 93 at 8 ¶
65).

ServiceMaster inspected the Property on December 18, 2020.  The parties

dispute the scope of authority JRT intended to give ServiceMaster.  According to Travelers, during the initial inspection, Kristine Heffner gave ServiceMaster verbal authorization over the telephone to "start the work" of cleaning up the fire damage. (ECF No. 77 at 5 ¶ 10.)  JRT partially disputes this statement, explaining that Kristine Heffner was unaware an inspection was occurring and merely authorized ServiceMaster to conduct the initial emergency mitigation at the Property.  (ECF No. 86 at 4 ¶ 10.)

The parties also dispute the nature of Travelers' involvement with ServiceMaster's work on the Property.  Travelers states that it did not have any involvement in the authorization that ServiceMaster received from JRT.  (ECF No. 77 at 5 ¶ 11; ECF No. 93 at 2 ¶ 11.)  On the other hand, JRT states that "Travelers oversaw, directed, and approved the work conducted by ServiceMaster, and has a separate contract with ServiceMaster," which Travelers denies.  (ECF No. 86 at 4 ¶ 11; ECF No. 93 at 2 ¶ 11.)

On December 19, 2020, ServiceMaster entered into a contract for services which was signed via DocuSign by JRT's tenant, Paul Frazier.  (ECF No. 77 at 5 ¶ 12; ECF No. 86 at 13 ¶¶ 51–52.)  JRT partially disputes this statement, clarifying that the work authorization was related to the tenant's damages associated with the fire, and ServiceMaster was authorized only to do work on the insurance claim related to Knuckle Head.  (ECF No. 86 at 4 ¶ 12.)

Travelers admits that Frazier signed the ServiceMaster contract, which had the tenant's insurance claim number and name on it, and explains that ServiceMaster felt the tenant was "kind of in charge to give [it] authorization to do mitigation on the loss." (ECF No. 93 at 2 ¶ 12; ECF No. 93 at 6 ¶ 49.)  Travelers further contends that JRT's

tenant had authority to act on its behalf as a result of Kristine Heffner providing ServiceMaster with verbal authorization to proceed over her tenant's speaker phone; according to Travelers, whether Frazier acted within his authority is not a material disputed fact for purposes of this Motion.  (ECF No. 93 at 6 ¶ 53.)  Relatedly, Travelers points out that the issues with respect to JRT, Frazier, and ServiceMaster and the work authorization are not material for purposes of this Motion, as Travelers was not party to the contract.  (ECF No. 93 at 7 ¶ 54.)

Although JRT contends it did not learn about ServiceMaster's demolition work at the Property until April 23 or 24, 2021 (ECF No. 86 at 15 ¶ 63), Travelers states that it spoke with Kristine Heffner in February 2021, advised her of remediation review, told her it left a message for her tenant to let him know approval was provided to move forward with remediation, and discussed involving a structural engineer (ECF No. 93 at 8 ¶¶ 61, 63).  Travelers states that Kristine Heffner understood and had no questions. (ECF No. 93 at 8 ¶ 63.)

JRT asserts that Travelers approved and authorized ServiceMaster to conduct demolition at the Property and lists several areas of work (ECF No. 86 at 15 ¶ 66), but Travelers only admits that it agreed to pay for the remediation measures that ServiceMaster proposed (ECF No. 93 at 8 ¶ 66).  According to JRT, Travelers authorized the removal of additional materials from the property after Golden Forensics LLC's[2] initial inspection, so that Golden Forensics could conduct a second inspection to better understand the alleged "preexisting" conditions.  (ECF No. 86 at 16 ¶ 69.) Travelers admits only that it authorized paying for the remediation measures proposed

---

[2] Golden Forensics LLC is an engineering consulting firm that Travelers hired.

by a contractor that had presumably signed a contract with the insured.  Travelers represented to JRT that "[a]ll of the materials that were removed as apart [*sic*] of the mitigation or engineers inspection will be accounted for in the rebuild portion of Travelers estimate."

ServiceMaster completed its work at the Property by the end of March 2021. Following ServiceMaster's work, JRT was unable to close up the walls, floors, or ceiling until the entire building was brought up to code.

Travelers sent JRT a letter which stated in part:

> Travelers worked with the mitigation vendor ServiceMaster DSI as it relates to the damage to the property.  From the communication that Travelers had with both yourself and the tenant, we were under the impression that you were comfortable with them completing the work necessary to mitigate the damages to the property.  Travelers did approve for ServiceMaster to complete the mitigation work under the assumption that they were providing updates to all parties involved in the loss as they proceeded.

(ECF No. 93 at 8–9 ¶ 71.)  While JRT asserts that Travelers did no independent investigation into the scope of work necessary to mitigate the Property and simply adopted ServiceMaster's estimates and scope of work (ECF No. 86 at 16 ¶ 72), Travelers explains that it relied on ServiceMaster's inspection and estimate, a fire inspector's report, made an Xactimate request, spoke to Kristine Heffner, spoke to the tenant at the Property, and relied on the report of Golden Forensics.  (ECF No. 93 at 9 ¶ 72).

The parties dispute whether the Property could have been adequately remediated without opening up the walls, floors, and ceiling, and tearing out the kitchen, bathroom, and office areas.  (ECF No. 86 at 17 ¶ 74.)  Travelers asserts that JRT has

no admissible evidence through its expert witness to refute the expert's own testimony that the preexisting conditions made the Property unsafe to occupy.  (ECF No. 93 at 9 ¶ 74.)  While JRT asserts that "[i]f the proper remediation scope had been used, 'the building would have been considered only non-compliant yet functional as is since it has been erected and functioning since the 1970s," (ECF No. 86 at 17 ¶ 75), Travelers disputes this statement and posits that Michael Beaty's[3] opinion that the Property should have been patched up and allowed to carry on serving hundreds of customers is "nonsensical."  (ECF No. 93 at 9 ¶ 75.)

**E.     Travelers' Payments to JRT**

On January 26, 2021, ServiceMaster provided an estimate to Travelers for "predominantly extensive cleaning, trash removal, detach and reset various items to clean and reset," in the amount of $36,324.17.  On January 29, 2021, and March 5, 2021, Travelers issued lost monthly income payments to JRT for the months of December–February in the amounts of $3,512.85 and $2,400.  On March 9, 2021, after accounting for JRT's deductible and depreciation, Travelers issued an Actual Cash Value ("ACV") payment totaling $60,144.26 to JRT.

According to Travelers, during the mitigation process, while "chasing" fire and smoke damage, ServiceMaster discovered numerous preexisting structural and code issues that were unrelated to the fire, but that made the building a risk for collapse and unsafe for occupancy.  (ECF No. 77 at 6 ¶ 16.)  By contrast, JRT states that much of the work conducted by ServiceMaster was unrelated to the fire damage, explains that Jason Dodge, upon whose testimony Travelers relies, is not an expert in this action, and that

---

[3] Michael Beaty is JRT's retained expert from Colorado Roofing & Restoration.

regardless, his testimony relates to the Maple Grove ServiceMaster in Minnesota and does not relate to the Property.  (ECF No. 86 at 5 ¶ 16.)  Travelers replies that the parties agree that ServiceMaster discovered extensive preexisting damage unrelated to the fire at the Property.  (ECF No. 93 at 3 ¶ 16.)  Further, it explains that Dodge is a ServiceMaster employee and percipient witness to the preexisting conditions discovered while mitigating the fire damage.  (*Id.*)  His testimony would be limited to what he observed at the building.  (*Id.*)

In response to the discovery of the preexisting structural and code issues uncovered by ServiceMaster, Travelers engaged Golden Forensics "to evaluate the condition of the property to determine the extent of damages and provide general repair recommendations related to a fire occurring on the reported date of loss."  Following an initial site evaluation on March 17, 2021, and a follow-up evaluation on April 22, 2021, Golden Forensics issued a Technical Report on May 6, 2021.  The report concluded:

> 1. The structural, mechanical, and electrical components of the structure were not affected by the fire.  2. At the time of our follow-up evaluation, the structure was unsafe to occupy. 3. The structural components need to be rehabilitated to meet existing building code due to substantial structural damage from nonstandard installation techniques, impacts during transportation and installation, and settlement of foundation components.

Following the investigation by Golden Forensics, Travelers issued an updated estimate to repair the Property on July 20, 2021, increasing the total ACV amount of the claim to $79,529.17.  JRT does not dispute that Travelers "update[d] its estimate to include the items from the Golden Forensics reinspection."

On July 20, 2021, after accounting for JRT's deductible, depreciation, and prior payments, Travelers issued an additional ACV payment to JRT totaling $18,884.91.

That same day, Travelers issued a partial denial letter dated July 8, 2021, advising that its inspection determined that structural, framing, and electrical damage were not a direct result of the fire and were preexisting due to wear and tear, faulty workmanship or mechanical breakdown.  That letter noted that since preexisting damage, settling, maintenance, improper workmanship or materials and/or code issues are not concurrently resulting from direct damage related to the loss, the Policy does not provide coverage.

JRT retained David Frates as a public adjuster or contractor who provided an estimate to repair the Property dated August 16, 2021, in the amount of $209,135.14. Travelers representatives Adrian Fryxell and Gabriel Duarte performed an inspection of the Property with Frates to assess his supplemental estimate.  The site inspection occurred on August 31, 2021.  Following the inspection, Travelers issued an updated estimate to repair the covered damage to the Property on July 20, 2021, increasing the total ACV amount of the claim to $149,184.53.  On September 29, 2021, after accounting for JRT's deductible, depreciation, and prior payments, Travelers issued an additional ACV payment to JRT for $72,055.36.

On November 5, 2021, JRT's expert, Beaty, provided an estimate on behalf of JRT for repairs to the structure in the amount of $700,254.68 to "bring the property back to a pre-loss condition," which included "the costs that are related to the fire and the remediation performed by ServiceMaster" as well as "costs to repair any preexisting damage to the property that might have been uncovered by ServiceMaster's work." Beaty's report called for a complete teardown and rebuild of the structure.  JRT clarifies that Pikes Peak Regional Building Department informed Beaty that given the condition

of the building after ServiceMaster's demolition and the code issues, it would not be possible to repair the building.

JRT contends that the fire damage to the Property was localized to the door frame and structure surrounding the door.  JRT further contends that the structural and electrical concerns arose solely due to alleged over-mitigation undertaken by ServiceMaster, but neither JRT nor Beaty dispute that these issues pre-existed any fire damage.  Kristine Heffner acknowledges that the foundation, structural, and electrical code upgrades were not related to the loss, and that the Property had foundation, structural, and electrical issues that existed prior to the date of loss.  Nevertheless, JRT states that prior to ServiceMaster's demolition work, these preexisting conditions were not a concern, and the Property was operating with no issues.

Travelers' retained expert, Brian Beatty, M.S., opines that: (i) the building was repairable from the damages sustained due to the fire; (ii) ServiceMaster followed industry standards to chase damages and in doing so identified additional building concerns related to the structural deficiencies with the building; (iii) the repair estimate provided by Plaintiff's expert at Colorado Roofing and Restoration represented repairs to both fire-related damage and preexisting damages; and (iv) the total cost related to the fire damage is $120,138.83.[4]  (ECF No. 77 at 10 ¶ 33.)

To date, Travelers has paid $149,184.53 in ACV payments for amounts owed directly related to the fire damage for necessary repairs and mitigation.  (ECF No. 77 at 10 ¶ 34.)  According to Travelers, JRT has not offered any evidence that Travelers has

---

[4] JRT disputes this fact and argues that ServiceMaster's demolition work on the Property fell below the standard of care.  (ECF No. 86 at 8 ¶ 33.)  The Court cautions the parties against making legal conclusions and arguments in their statements of material facts.

not covered all benefits owed directly related to the fire.  (*Id.*)  In response, JRT states that Travelers has not paid for all damages related to the fire, pointing to the fact that ServiceMaster, at Travelers' request, removed kitchen equipment and other fixtures from the Property as a result of the fire that were not included in Travelers' estimates and for which JRT has not received payment.  (ECF No. 86 at 9 ¶ 34.)  However, JRT does not dispute that Travelers has paid $149,184.53 in ACV payments on the claim.

Specifically, JRT states that Travelers has not paid for the fryer, range, range hood, walk-in cooler and freezer, sink, and kitchen shelving.  (ECF No. 86 at 12 ¶ 42.) Travelers does not deny this statement, but argues that JRT has "failed to adduce evidence showing that these items were fixtures were damaged [*sic*] or disposed of as opposed to being held in storage."  (ECF No. 93 at 6 ¶ 42.)  JRT states that Travelers has not paid it for any code upgrades (ECF No. 86 at 12 ¶ 43), but Travelers clarifies that it has not paid because JRT has not rebuilt the Property, and Travelers does not owe for code upgrades until they are completed (ECF No. 93 at 6 ¶ 43).

Throughout the course of the claim, Travelers continually issued lost monthly income payments to JRT, and according to JRT, all loss of income was paid in a timely fashion.

To date, the only completed work is the demolition of the property.  No other physical construction has been completed.  According to JRT, it has not been financially able to begin other construction work because Travelers has not paid for all damages related to the fire.  (ECF No. 86 at 10 ¶ 36.)

JRT undisputedly incurred $35,101.86 in costs related to the demolition of the Property.  (ECF No. 86 at 17 ¶ 77.)  Travelers concedes the amount but states that

those costs were not incurred or billed to JRT until January 24, 2023, almost a year after this action was filed; thus, Travelers argues that JRT "cannot bootstrap costs incurred months after it filed suit and to which Travelers was not consulted, to a claim that Travelers unreasonably withheld payments."  (ECF No. 93 at 10 ¶ 77).

## III. PROCEDURAL HISTORY

On April 5, 2022, JRT filed a lawsuit against Travelers and ServiceMaster.  (ECF No. 7 (Amended Complaint).)  JRT filed one claim against ServiceMaster for negligence and filed breach of contract and statutory unreasonable delay claims against Travelers.[5]  JRT alleges that Travelers breached the Policy by not paying for property loss and unreasonably delaying and/or denying payment of benefits to JRT.  (*Id.* ¶¶ 86–96.)

On May 5, 2022, Travelers removed this action from El Paso County District Court pursuant to this Court's diversity jurisdiction.  (ECF No. 1.)

## IV. ANALYSIS[6]

### A.    Golden Forensics' Technical Report

In the sections concerning material facts in their briefs, the parties dispute the manner in which Golden Forensics' Technical Report may be used in the summary judgment motion and at trial.  When Travelers cited to portions of the Golden Forensics Technical Report in its Statement of Facts (*see, e.g.*, ECF No. 77 at 6–7 ¶¶ 17–18), JRT responded that

> Defendant's statement contains inadmissible speculative
> evidence. Pursuant to Fed. R. Civ. P. 56(c)(2) "material cited

---

[5] In its Motion, Travelers states that JRT also sued it for common law bad faith.  (ECF No. 77 at 11 ¶ 37.)  However, JRT points out that it has not asserted such a claim.  (ECF No. 86 at 10 ¶ 37.)

[6] Both parties apply Colorado law to the claims in this action.  (ECF No. 77 at 12; ECF No. 86 at 18.)

to support or dispute a fact cannot be presented in a form that would be inadmissible in evidence."  The court may consider only admissible evidence when ruling on a summary judgment motion.  *Newland v. Stevinson Toyota E., Inc.*, 505 F. Supp. 2d 689, 696 (D. Colo. 2007).  There is no dispute that the Golden Forensics Report contains expert opinions, yet Travelers did not offer this report (or its author) as either a retained or non-retained expert in this matter.  *See* Exhibit 8, Travelers Expert Disclosures and Exhibit 9, ServiceMaster Expert Disclosures.  Thus, Travelers has not designated any expert to testify as to the contents of this Report.

(ECF No. 86 at 5–6 ¶¶ 17–18.)

Travelers replies:

Plaintiff claims that the three conclusions from the Golden Forensics Report are "inadmissible speculative evidence" because no expert has been designated to testify as to those conclusions.  This claim is misplaced.  Golden Forensics' employees were percipient witnesses to the preexisting conditions discovered at the Property.  Golden Forensics will not be offering expert testimony under Federal Rule of Evidence 702, but rather its observations as to the safety and status of the building under Rule 701. In addition, as both Travelers' and Plaintiff's experts relied on this report in forming their opinions, those experts may testify to its findings under Federal Rule of Evidence 703. Moreover, the fact that the building was unsafe to occupy due to preexisting conditions is undisputed, and explicitly acknowledged by Plaintiff's Expert.

(ECF No. 93 at 3–4 ¶ 18.)

Based on the parties' statements, the Court rules as follows.  With respect to a Response to Movant's Material Facts, WJM Revised Practice Standards III.F.4.c provides: "The opposing party may not 'deny' an assertion on grounds of evidentiary inadmissibility or other reasons for inadmissibility (including immateriality, irrelevance, lack of authenticity, lack of foundation, incompleteness, waiver, or estoppel).  The opposing party "may object that the material cited to support or dispute a fact cannot be

presented in a form that would be admissible at trial," Fed. R. Civ. P. 56(c)(2), and any party so objecting must include a concise explanation of its objection, but the party must still admit or deny the factual substance of the assertion."

JRT's Response to Statement of Undisputed Material Facts, reiterated above, violates the undersigned's Revised Practice Standards III.F.4.c.  JRT has not denied the underlying facts set forth in ServiceMaster's Movant's Statement of Undisputed Facts, paragraph 17, which lists numerous preexisting conditions.  Moreover, JRT clearly admits in its response that as a result of ServiceMaster's work, "preexisting conditions at the property were exposed."  (ECF No. 86 at 2.)  And Kristine Heffner acknowledges that these issues existed prior to the fire in her Rule 30(b)(6) deposition.  (ECF No. 77 at 9 ¶ 12 (citing ECF No. 77-3).)  Accordingly, the Court deems these facts admitted.

## B.      Breach of Contract

"It has long been the law in Colorado that a party attempting to recover on a claim for breach of contract must prove the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff."  *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

Travelers argues that JRT cannot establish the third and fourth elements of its breach of contract claim.[7]  (ECF No. 77 at 12.)  Here, JRT argues that Travelers breached its contract by failing to pay "for property loss, and that loss's proper value, as required by the Policy."  (ECF No. 7 at 8.)  However, Travelers responds that the

---

[7] Travelers does not argue that JRT cannot prove the first and second elements of the breach of contract claim, so the Court discusses only elements three and four.

"undisputed facts establish that Travelers paid $149,184.53 for mitigation and the repair of damages caused by the fire," and JRT "has not provided any evidence that Travelers has not covered all benefits owed directly related to the fire." (*Id.* at 13.)  Specifically, JRT does not dispute that structural and foundation issues preexisted the fire, instead arguing that had ServiceMaster not over-mitigated the fire loss, those preexisting conditions would never have been discovered.  (*Id.*)  Accordingly, Travelers argues that because JRT has not produced any evidence to show that it failed to perform under the Policy or any resulting damages, JRT's breach of contract claim must fail.  For the following reasons, the Court agrees.

      1.    <u>Wear and Tear Is Excluded from Coverage Under the Policy</u>

The question of coverage begins with the terms of an insurance policy, the interpretation of which is a legal question.[8]  *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002).  As a contract, an insurance policy should be interpreted consistently with the well-settled principles of contract interpretation.  *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990).  The words of the contract should be given their plain meaning according to common usage, and strained constructions should be avoided.  *Allstate Ins. Co. v. Starke*, 797 P.2d 14, 18 (Colo. 1990).  Clear and unambiguous policy provisions should be enforced as written, and courts should not strain language or logic to create alternative interpretations solely to resolve coverage questions for the insured.  *Chacon*, 788 P.2d at 750; *Kane v. Royal Ins. Co. of America*, 768 P.2d 678, 683 (Colo. 1989).  An insurer cannot be liable beyond the scope of risks

---

[8] JRT does not dispute the legal principles set forth in the Motion concerning Colorado coverage law.  Therefore, the Court repeats the principles as set forth in the Motion.  (ECF No. 77 at 13–14.)

clearly covered in the policy.  *Kane*, 768 P.2d at 683.

"Where, as here, an insurance company seeks to limit or exclude coverage under the terms of an insurance policy, the insurer bears the burden of proving that a particular loss falls within an exclusion in the contract."  *Lodge at Mountain Vill. Owner Ass'n, Inc. v. Eighteen Certain Underwriters of Lloyd's of London*, 591 F. Supp. 3d 1008, 1015 (D. Colo. 2022) (citation omitted).  "However, when an insurance company shows that an exclusion applies, the burden falls on the insured to show the applicability of an exception to the exclusion."  *Id.* (citing *Rodriguez ex rel. Rodriguez v. Safeco Ins. Co. of Am.*, 821 P.2d 849, 853 (Colo. App. 1991)).

The Policy obligates Travelers to pay for "risks of direct physical loss" subject to the Policy's terms, conditions, limitations, and exclusions (ECF No. 77-1 at 1) and that preexisting damages caused by a separate uncovered cause of loss are excluded (ECF No. 77-1 at 24 (excluding wear and tear, among other things)).

Here, on December 16, 2020, JRT reported to Travelers a claim for fire damage to the Property.  Travelers paid JRT to remediate and repair the damage caused by the fire and partially denied coverage for the preexisting structural and foundation damage due to wear and tear, faulty workmanship, and mechanical breakdown.  Travelers' inspections determined there were significant and dangerous preexisting issues unrelated to the fire to the building's structural, foundation, and electrical components which made the building unsafe for occupancy.  (ECF No. 86-12 at 12 (Beaty opinion existing structure is unsafe to occupy).)  These preexisting issues were due to wear and tear, faulty workmanship, and mechanical breakdown.

"'Generally, whether an insurance contract covers a loss hinges on whether the

proximate cause of the loss was a type of cause covered by the agreement.'"  *Roof Rehab LLC v. Travelers Cas. Ins. Co. of Am.*, 2022 WL 17976719, at *6 (D. Colo. Sept. 6, 2022) (quoting *Colorado Intergovernmental Risk Sharing Agency v. Northfield Ins. Co.*, 207 P.3d 839, 842 (Colo. App. 2008)).  "The efficient proximate cause doctrine provides that when a loss is caused by the combination of both covered and excluded perils, the loss is fully covered by the insurance contract if the covered risk proximately caused the loss."  *Id.*  "In evaluating a loss, where there is concurrent causation, the efficient cause (the one that sets others in motion) is the cause to which the loss is to be attributed."  *Id.* (internal quotation marks omitted).

Here, JRT attempts to raise a dispute of fact concerning whether Travelers has failed to pay for code items, fixtures, and permanently attached machinery and equipment (ECF No. 86 at 19–21), as well as whether Travelers breached the duty of good faith and fair dealing by "authoriz[ing] and direct[ing] the scope of work performed by ServiceMaster" (*id.* at 26–28).  However, as explained above, there is no dispute that the structural, foundational, and other preexisting conditions all existed *before* the fire, and before ServiceMaster began its work on the Property.  JRT's attempt to raise a genuine dispute of material fact is insufficient to defeat the Motion.  The fact that the preexisting conditions were only discovered when the remediation arising from the fire damage began does not change the fact that the cause for the need to address the preexisting conditions was their poor condition due to wear and tear, and *not* the fire or Travelers' alleged direction or authorization of ServiceMaster's work on the Property.  *See Roof Rehab*, 2022 WL 17976719, at *6; *see also Elite Custom Builders, LLC v. State Farm Fire & Cas. Co.*, at *18–19 (Colo. App. April 30, 2020) (unpublished)

(provided as Exhibit AA to Travelers' reply) (ECF No. 93-8) ("[T]he fact remains that the hailstorm did not cause any damage to the sheathing, and therefore the damage that caused the financial detriment of replacing the sheathing was not the same as the damage that caused the financial detriment of replacing the shingles.  For that reason, the cost to replace the sheathing is not simply part of the replacement cost of the shingles.  Instead, it is a different 'loss' altogether.").

      2.    <u>JRT's Arguments that an Exception Exists Are Without Merit</u>

          a.    *Duty of Good Faith and Fair Dealing*

JRT contends that "Travelers failed to properly adjust the Claim by failing to reasonably investigate the damages and necessary scope of repair and by failing to adequately communicate with JRT throughout the life of the claim."  (ECF No. 86 at 27.)  Additionally, JRT contends that "Travelers entered into a contact [*sic*] with ServiceMaster and authorized and directed the scope of work performed by ServiceMaster, and because the work was performed at Travelers' request, Travelers must be vicariously responsible for the damages caused by ServiceMaster."  (*Id.*)  Accordingly, JRT argues that Travelers breached its duty of good faith and fair dealing.  (*Id.*)

Despite JRT's arguments, the Court agrees that Travelers cannot be legally responsible for ServiceMaster's work.  Although JRT continuously asserts that Travelers and ServiceMaster entered into a contract, the Court sees no contract in the record, merely deposition testimony that does not substantiate the assertion that such a contract exists.  (*See* ECF No. 86 at 4 ¶ 11 (numerous citations).)  JRT points to no Policy provision requiring Travelers to supervise or monitor ServiceMaster, nor does JRT suggest that Travelers or ServiceMaster represented that it would do so.  (*Id.*)

While Travelers may have authorized payment for ServiceMaster's work, that does not rise to level of directing its work on the Property such that it is legally responsible for the damages JRT claims.

Travelers points to evidence in the record demonstrating that JRT, through its representative Kristine Heffner, was aware that ServiceMaster was working on the Property and that Travelers was authorizing payments.  In a January 14, 2021, letter, Kristine Heffner wrote to Gabriel Duarte, Travelers' claims adjuster, she wrote:

> I guess the claim was handed over to you because you are a larger loss adjuster.  I have not had any communication from you at all.  Only today, our tenant, Paul Frazier, called me and mentioned that his adjuster Keegan told him that you, through our coverage with Travelers, are supposed to be paying us for loss of rent.
>
> Thus far, the lost rent is $1,200 for the second half of December, 2020, and $2,400 for the January rent.  I am sure that February and March could also be in play, *based on the time it is taking for Travelers to authorize any go ahead for Service Master to begin work on the building*.

(ECF No. 93-1 (emphasis added).)

"Generally, one not a party to a contract cannot be liable for its violation."  *Dunn v. Am. Fam. Ins*., 251 P.3d 1232, 1236 (Colo. App. 2010) (citing *Gorab v. Equity Gen. Agents, Inc.*, 661 P.2d 1196, 1198 (Colo. App. 1983)).  As Travelers points out, JRT has not identified a Policy provision requiring Travelers to supervise or monitor independent contractors such as ServiceMaster, nor has JRT submitted anything to suggest that Travelers represented to it that it would provide this service.  *See id.* (insurer had no duty to effectively act as independent contractor's liability insurer).  Rather, the record shows that Travelers was approving ServiceMaster's estimates and that, at least for some work, JRT's tenant, Paul Frazier, was also approving ServiceMaster's work.

(ECF No. 93-2 at 5.)  Moreover, Jason Dodge, ServiceMaster's corporate representative, testified at his deposition that Kristine Heffner indicated that she did not want to be involved in the Project, and as a result, he sought approval from Paul Frazier, "pretty much [the] man in charge."  (*Id.*)

At least one division of the Colorado Court of Appeals has concluded that "when an insured selects and retains an independent contractor, even upon the recommendation of his or her insurer, the insured has primary responsibility for supervising the contractor, absent any representation that the insurer would assume that duty."  *Dunn*, 251 P.3d at 1236 (citation omitted).  "Further, when an independent contractor's negligence causes damage beyond the initial loss, the insured's proper remedy is to recover from that contractor."  *Id.* (citations omitted).  The Colorado Court of Appeals reasoned that to hold otherwise "would effectively render an insurer the liability carrier for any independent contractor performing work for its insured."  *Id.*

Given the Colorado authority concluding that even when an independent contractor is retained at the recommendation of the insurer, the insured has the primary responsibility of supervising the contractor, the Court cannot find as a matter of law that Travelers breached its duty of good faith and fair dealing by not effectively acting as a liability carrier for ServiceMaster.

b.    *Code Upgrades*

JRT contends that the Court should deny the Motion at least in part because "Travelers has not paid for code upgrades triggered by the covered loss."  (ECF No. 86 at 19.)  JRT explains that "Pikes Peak Regional Building Department indicated that given the condition of the building after ServiceMaster's demolition, and given the code issues, it would not be feasible to repair the building in its current condition."  (*Id.* at 20.)

22

As a result, JRT states that it incurred $35,101.86 in costs related to the demolition of the Property, which Travelers has not addressed or paid for in any manner.  (*Id.* at 21.) For support, JRT points to the Policy provision concerning Ordinance or Law.

Despite JRT's arguments, the Ordinance or Law provision only covers "damage by a Covered Cause of Loss", and the fire was not the cause of the preexisting conditions that led to Pikes Peak Regional Building Department's enforcement of the building codes.  Rather, the Court agrees with Travelers that the fire was merely a precipitating event that led to the uncovering of the preexisting code violations.  (*See* ECF No. 77 at 19.)

Similarly, in *My Roofer, Inc. v. State Farm Fire and Casualty Company*, No. 16CA1478 (Colo. App. Sept. 14, 2017), the Colorado Court of Appeals affirmed the trial court's reasoning that "'even if there had been no building code that applied here, [My Roofer] still would've had to replace the roof decking.'  As a result, the court could not conclude that, 'but for the enforcement of a building, zoning, or land use ordinance,' the decking would not have had to be replaced."  In *My Roofer*, the court found that "[t]he preexisting damage to the decking, rather than enforcement of the building code, caused the need to replace the decking . . . .  While the code may have elevated the practical need to replace the decking to a legal obligation, the code did not cause this need.  The code merely recognized this need."  *Id.*

The Court concludes that the reasoning in *My Roofer* also applies to this case. *See also Chattanooga Bank Associates v. Fidelity & Deposit Co. of Maryland*, 301 F. Supp. 2d 774 (E.D. Tenn. 2004) (no coverage for the cost of remedying preexisting code violations to nondamaged portions of a building); *Kosich v. Metro. Prop. &*

*Casualty Ins. Co.*, 626 N.Y.S.2d 618, 618-19 (N.Y. App. Div. 1995) (although "contractor's cutting into vinyl floor with a chain saw set in motion a chain of events that ultimately resulted in plaintiff's losses" by releasing asbestos from the floor, those losses were "proximately caused by asbestos contamination," not the contractor's actions or the construction of the floor.  The Court concludes that Travelers properly denied JRT's claim for the preexisting damages not caused by the fire under the provisions of the Policy and relevant Colorado authority.

   c. *Kitchen Equipment*

  JRT also argues that Travelers has not paid for kitchen equipment that was removed from the Property as a direct result of the fire and the ensuing demolition. (ECF No. 86 at 21.)  Specifically, JRT states that "the fryer, range, range hood, walk-in cooler and freezer, sink, and kitchen shelving were all removed from the Property (allegedly as a result of the fire)."  (*Id.*)  These items cost "at least $50,000 to replace," and "[d]espite being covered under the Policy, Travelers has not accounted for the replacement of any of these items in its estimate and has failed to pay JRT for these damages."  (*Id.*)  For support, JRT points to the provision of the Policy that states that covered property includes "the building or structure described in the Declarations including . . . (3) Fixtures."  (*Id.* at 10 ¶ 39.)

  In its reply, Travelers points out that JRT does not dispute that Travelers has paid $149,184.53 in ACV payments on this claim.  (ECF No. 93 at 5 ¶ 34.)  It explains that JRT has only demonstrated "that JRT owns items tied to the building, but not loose items and that ServiceMaster 'moved some contents' to on-site storage containers." (*Id.*)  JRT's tenant "also testified that the kitchen equipment was moved to containers and that much of it was theirs as opposed to Plaintiff's."  (*Id.* (citing ECF No. 93-4 (Ex.

W Knuckle Head 339 LLC deposition at 73:6- 74:14 (coolers, freezers, and wall fixtures removed to containers); 77:19-79:4 (fryer, range, range hood, walk-in cooler and freezer, and sink belonged to tenant)).)  The Court agrees with Travelers that this testimony does not establish that Travelers failed to pay covered benefits for these items, but rather that their current whereabouts are unknown.  (ECF No. 93 at 5.)  As a result, such evidence is insufficient to demonstrate a genuine issue of material fact exists and overcome the Motion.

**C.    Statutory Bad Faith**

JRT also asserts a statutory delay/denial bad faith claim.  In Colorado, a person "engaged in the business of insurance shall not unreasonably delay or deny payment" to an insured.  Colo. Rev. Stat. § 10-3-1115(1)(a).  To establish a claim under § 10-3-1115, a plaintiff "must therefore show that: (1) benefits were owed under the policy and (2) defendant unreasonably delayed or denied payment of plaintiff's claim."  *TBL Collectibles, Inc. v. Owners Ins. Co.*, 285 F. Supp. 3d 1170, 1201 (D. Colo. 2018).

Because there is no genuine issue of material fact as to whether Travelers breached the contract, it owes JRT no benefits, and the statutory bad faith claim fails as a matter of law.  *See Polland v. State Farm Mut. Auto. Ins. Co.*, 2019 WL 10258801, at *7 (D. Colo. Oct. 25, 2019), *reconsideration denied*, 2020 WL 6799934 (D. Colo. Nov. 19, 2020).  As a result, the Court finds that Travelers is entitled to summary judgment on JRT's statutory delay/denial claim.

### V. CONCLUSION

Accordingly, for the reasons stated, the Court ORDERS as follows:

1.     Defendant's Motion (ECF No. 77) is GRANTED as set forth above;

2.     At such time as the Clerk enters final judgment in this action, the Clerk shall enter

judgment in favor of Defendant Travelers Casual Insurance Company of America and against Plaintiff Joseph Heffner, as trustee of the Josephine Renard Trust;

3.      The parties and the Clerk shall delete all reference to Travelers in the caption of any subsequent filing or docket entry; and

4.      This case remains SET for a Final Trial Preparation Conference on September 13, 2024 and a five-day jury trial to begin on September 30, 2024 (ECF No. 98).

Dated this 28th day of February, 2024.

BY THE COURT:

William J. Martínez
Senior United States District Judge